## AFFIDAVIT

I, Austin M. Roseberry, having been duly sworn, do hereby state and depose as follows:

1.      Affiant is a Special Agent (SA) for the United States Drug Enforcement Administration (DEA) within the meaning of Title 21, United States Code, Section 878, that is an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by Affiant or relayed to Affiant by other law enforcement officers involved in this investigation. Affiant has been employed as a Special Agent with the Drug Enforcement Administration since July 2012, and worked at the Drug Enforcement Administration office in Dayton, Ohio since May 2017. Affiant has been involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance in drug trafficking investigations of an international scope. Through training and experience, Affiant is familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

# I.

## PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of a search warrant associated with a drug trafficking organization operating in the greater Dayton, Ohio area.   The application seeks the issuance of a search warrant for the following addresses:

   a.  1701 W. High Street, Springfield, OH (hereinafter "**TARGET LOCATION 1**"), including any lockers, basements, or storage areas associated with this location. The **TARGET LOCATION 1** is more fully described in Attachment A, which is incorporated herein by reference.

   b.  2641 Hibiscus Way, Apt. 221, Beavercreek, Ohio, 45431 (hereinafter "**TARGET LOCATION 2**"), including any lockers, basements, or storage areas associated with this location.   **TARGET LOCATION 2** is more fully described in Attachment A, which is incorporated herein by reference.

   c.  1710 N. Sweetbriar Lane, Springfield, Ohio 45505 (hereinafter "**TARGET LOCATION 3**"), including any lockers, basements, or storage areas associated with this location.   **TARGET LOCATION 3** is more fully described in Attachment A, which is incorporated herein by reference.

4.    As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") are being stored at or can be

2

found in the **TARGET LOCATIONS**, including surrounding curtilage, outbuilding, or garages associated with this property:

a. Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b. Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

5. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B be found at the premises described above.

## II.

## PROBABLE CAUSE FOR TARGET LOCATION

6. I submit, based on the facts below, there is probable cause to believe the **TARGET LOCATIONS**, as described above, is being utilized by Brittany CAMP ("CAMP") in addition to Marlon BURG ("BURG"). I believe CAMP and BURG to be actively engaged in drug trafficking violations of 21 U.S.C. §§ 846 and 841 (possession with the intent to distribute and to distribute a controlled substance and conspiracy to commit the same).

7. On or about February 2021, the Detroit FBI Violent Gang Task Force (VGTF) and Michigan State Police Metro Narcotics Enforcement Task Force (MNET) began an investigation into a drug trafficking organization in Detroit, Michigan. During the course of the investigation, Shannon BOWDEN was identified as a mid-level drug trafficker. On June 10, 2021, MNET Detectives along with FBI VGTF executed search warrants on BOWDEN's supplier at three locations in the city of Detroit. Detectives located a total of 2,902.7 grams of heroin (approximately 3 kilograms), 505.2 grams of Cocaine (approximately a half kilogram), 493 grams

of crystal meth (approximately a half kilogram), 13 firearms of which 5 were identified as stolen, and $121,419.00 in U.S currency (various denominations).

8.      On or about August 4, 2021, the DEA Dayton Resident Office (hereinafter referred to as "DRO") was contacted by a VGTF/ MNET investigator regarding BOWDEN, who was observed, via electronic surveillance by Detroit investigators, to be travelling southbound from the Detroit, MI area and in the direction of Dayton, OH.   On this same date, members of the DRO conducted mobile surveillance of the identified vehicle that BOWDEN was utilizing, a black Dodge Ram bearing MI license plate DRH0788, wherein investigators observed BOWDEN travel to and park at **TARGET LOCATION 2**.

9.      On the same date, agents observed, through a window to the common stairwell of the **TARGET LOCATION 2** building, BOWDEN and a second, unknown individual exit a door on the second floor. This specific door was later identified as Unit 221 of 2641 Hibiscus Way, the **TARGET LOCATION 2**. Agents then observed BOWDEN enter the Dodge Ram, at which time some investigators maintained mobile surveillance until BOWDEN was observed travelling to I-75 and continue northbound at which time mobile surveillance ended. Several investigators stayed behind at the **TARGET LOCATION 2** wherein SA Roseberry observed this second, unknown male enter into and start a Buick LaCrosse (hereinafter referred to as "Buick"), with OH license plate JCZ3473. Investigators then maintained mobile surveillance on the Buick and observed it to travel to Walmart, located at 3360 Pentagon Blvd., Beavercreek, OH. Law enforcement then observed the unknown male exit the Buick and enter Walmart, unaccompanied. Law enforcement then maintained surveillance on the unknown male in the Walmart store and observed this individual purchase a quantity of groceries and food items, exit the store, and enter into the Buick. SA Wagner then observed the Buick return to **TARGET LOCATION 2** apartment complex

parking lot and observed the unidentified male approach the **TARGET LOCATION 2** building, at which time visual surveillance of the male could no longer be maintained.

10.     Agents conducted a database search of the Buick and learned that the Buick was registered to Brittany CAMP at **TARGET LOCATION 1**. SA Wagner was then able to view a driver's license picture of CAMP.

11.     On or about August 9, 2021, BOWDEN was observed, via electronic surveillance, travelling from the Detroit, MI area towards the Dayton, Ohio area. At this time, SA Wagner set up surveillance at **TARGET LOCATION 2**. At approximately 12:38pm, SA Wagner observed a female, wearing a tie-dyed shirt and shorts and matching the driver's license picture of CAMP, walk across the parking lot of **TARGET LOCATION 2** and enter into the Buick and depart the area. On the same date, at approximately 1:03pm, I observed the Dodge Ram, via electronic surveillance, arrive at the **TARGET LOCATION 1**, which is the registered address for CAMP. I then traveled to the vicinity of the aforementioned residence wherein I observed, via electronic surveillance, that at approximately 1:05pm the Dodge Ram had already departed the area and was traveling in the direction of Beavercreek, OH. I continued on to the **TARGET LOCATION 1** wherein, at approximately 1:10pm, I observed that the Buick was parked in the vicinity of the **TARGET LOCATION 1**. I maintained electronic surveillance on the Dodge Ram until it arrived at **TARGET LOCATION 2.** At approximately 1:29pm, law enforcement observed BOWDEN and a juvenile park in the **TARGET LOCATION 2** parking lot, exit the Dodge Ram with large bulges in their pants pockets, and subsequently enter into the **TARGET LOCATION 2** common stairwell. After some time, law enforcement observed BOWDEN and the juvenile exit the **TARGET LOCATION 2** common stairwell, their pockets significantly flattened but with the juvenile's front left pants pocket now appearing to contain an item that had squared edges.

5

The juvenile manipulated something in the rear seat of the Dodge Ram, and then both entered into the Dodge Ram, and travelled in the direction of I-75 northbound.

12.     On the same date and after the Dodge Ram had departed, law enforcement observed CAMP operating the Buick.   Investigators observed the Buick parked in the vicinity of 111 Race Street, Springfield, Ohio.   A short time later, CAMP was observed to be parked near the **TARGET LOCATION 1**.   At this time, law enforcement observed a green SUV arrive at the **TARGET LOCATION 1** and an unknown white male subject entered into the Buick. A moment later the white male subject exited the Buick.   At this time, the Buick departed the area, but surveillance was not maintained.     Based upon my training and experience, the aforementioned activity involving short trips and meetings with individuals for short durations, at multiple locations, is consistent with drug trafficking, to include hand-to-hand purchases and transactions.

13.     Investigators were able to locate and identify CAMP's phone number through recent utilities listings for **TARGET LOCATION 2**.   On August 12, 2021, during the analysis of CAMP's phone tolls, (937) 993-6779 was identified as a frequent contact. (937) 993-6779 was identified through a publicly accessed mobile application as being attributed to a Marlon BURG. A query of public records databases revealed there is only one Marlon BURG in the state of Ohio. A prison photo of Marlon BURG was shown to me, and I immediately identified BURG as the individual observed on surveillance on August 4th driving the Buick.   BURG is a multi-state offender and has a criminal history that includes, but is not limited to, aggravated trafficking in drugs, trafficking in crack with specification, trafficking in drugs, corrupting another with drugs, trafficking drugs within 1000ft of a school, drug trafficking, drug paraphernalia, possession of drugs (marijuana), possession of drugs, tampering with evidence, tampering with records,

possession of crack cocaine, weapons under disability, trafficking in drugs containing marijuana, trafficking, stolen vehicle, receiving stolen property, assault with intent to murder, weapons felony firearm, weapons offense, carrying concealed weapon, dangerous drugs, attempted robbery with a deadly weapon, and trafficking in controlled substances.

14.     On August 12, 2021, I was provided a report from the Michigan State Police detailing the arrest of Marlon BURG on October 19, 2020.   The Michigan State Police COMET Interdiction Team was conducting routine bus interdiction looking for criminal activity and drug trafficking.   An investigator consensually encountered BURG who provided his name was James GREENE and then recanted stating his name was not James.   BURG was arrested for giving a false name to a police officer.   During arrest, it was observed that BURG had a large bulge in his front pants packet.   BURG was found to be in possession of two pill bottles containing 314 suspected oxycodone pills both pill bottles were labelled with Shannon BOWDEN.

15.     On or about August 13, 2021, I observed, via electronic surveillance, BOWDEN's Dodge Ram traveling in the direction of Dayton, Ohio. On this same date, I observed GPS location data reveal BOWDEN's Dodge Ram traveled to and parked in the vicinity of the **TARGET LOCATION 1**. At this same time, law enforcement observed the Buick park directly in front of the Dodge Ram. A male subject wearing white, matching the description of BURG, was observed exiting the Buick and walking back to the Dodge Ram and entering into the vehicle.   Following this, law enforcement observed CAMP exit the Buick and approach the Dodge Ram passenger window to speak with the occupant before entering into the **TARGET LOCATION 1**. A short time late, BURG was observed, dressed in white pants and a white shirt, exiting the passenger seat of the Dodge Ram and entering into the **TARGET LOCATION 1**. At this same time, BOWDEN exited the driver's seat of the Dodge Ram and also approached the **TARGET**

7

**LOCATION 1**. BURG was observed to approach the Dodge Ram with BOWDEN at which time BURG entered into the passenger seat of the truck while BOWDEN entered into the driver's seat of the truck. A few moments late, CAMP exited the **TARGET LOCATION 1**, reached into the window to the passenger of the Dodge Ram (BURG), and entered into the driver's seat of the Buick. Approximately a few minutes later, BURG exited the Dodge Ram and entered into the passenger side of the Buick wherein both vehicles departed the area at the same time.

16.     On or about August 23, 2021, SA Wagner secured a search warrant for a global positioning system (GPS) for the Buick and, on August 27, 2021, members of the DEA DRO installed the aforementioned GPS wherein electronic surveillance was maintained by SA Wagner. This electronic surveillance revealed that the Buick frequently travelled to and from the **TARGET LOCATION 1** and the Beavercreek, OH area, specifically **TARGET LOCATION 2**.

17.     On August 31, 2021, Sa Wagner observed two individuals matching the physical descriptions of CAMP and BURG exit **TARGET LOCATION 2** and enter the aforementioned BUICK. Physical surveillance and electronic surveillance of the Buick revealed the Buick travelled to **TARGET LOCATION 1** where investigators observed CAMP enter **TARGET LOCATION 1** for approximately 2 minutes and return to the Buick. Investigators observed the Buick travel to another residence in Springfield for approximately 2 minutes before departing and travelling back to **TARGET LOCATION 2**. Based upon your Affiant's training and experience, I know that drug traffickers often travel to locations spending short periods of time to conduct drug transactions. Furthermore, your Affiant knows that drug traffickers often store their drugs at locations where they do not commonly reside. The short trip to **TARGET**

8

**LOCATION 1** immediately before travelling to a suspected drug deal is common for the utilization of a drug stash house.

18.     On or about September 6, 2021, SA Wagner observed, via electronic surveillance, that the Buick traveled from the vicinity of the **TARGET LOCATION 2** and to the Detroit, MI area. It is known to investigators and your affiant that Shannon BOWDEN, BURG's suspected source of supply, is located in the Detroit, MI area and others yet to be identified. On this same date, the Buick then traveled back to the **TARGET LOCATION 1** at approximately 6:24 p.m., before continuing to **TARGET LOCATION 2** at approximately 7:08 p.m.   Electronic surveillance revealed the Buick continued from **TARGET LOCATION 2** to multiple locations in the Dayton, Ohio area. Based upon your Affiant's training and experience, this behavior is consistent with the trafficking of a narcotics or bulk United States currency transaction.

19.     On September 20, 2021, your Affiant observed electronic surveillance data for the Buick which revealed that Buick travelled from **TARGET LOCATION 2** to Detroit, Michigan. Members of MNET began physical surveillance of the Buick as the Buick travelled northbound on I-75 approaching Detroit, Michigan.   Investigators observed the Buick travel to the United States Post Service (USPS) Post Office located at 3434 Chene Street, Detroit, Michigan. Investigators observed a black male subject matching the physical description of BURG exited the Buick and entered the Post Office.   Moments later, investigators observed BURG exiting the post office with what appeared to be a white box-shaped object and returned to the aforementioned Buick.   Investigators followed the Buick to a nearby apartment building where investigators observed BURG and an unknown male subject enter the apartment building together.   Approximately 7 minutes later, investigators observed BURG return to the Buick and retrieve an object and place it into his right front pants pocket before returning to the same

9

apartment building. Approximately 3 minutes later, investigators observed BURG exit the apartment building and return to the Buick. Investigators followed the Buick to the USPS Post Office located at 10254 Gratiot Avenue, Detroit, MI. Investigators observed BURG enter the post office and return to the vehicle carrying a white object before entering the Buick. Moments later, BURG exited the Buick carrying a white object into the post office, before returning to the Buick moments later without the white object. Upon BURG leaving the post office, investigators entered the post office and contacted the postal worker. The investigators located two packages that BURG had just mailed. Investigators observed that the two packages were both addressed to residences in Springfield, Ohio. One package was addressed to **TARGET LOCATION 1** to a John Jackson with a return address of "Lamont Jackson, 15838 Tuller, Detroit, MI 48238". The second package was sent to Sharon Stickney at **TARGET LOCATION 3** from the return address from "Jessica Price, 15838 Tuller, Detroit MI 48238". United States Postal Inspector Edmond Rose seized the packages and contacted a K-9 handler to conduct a free air sniff of the packages. Inspector Rose indicated to your affiant that the drug detecting K-9 alerted to the presence of the odor of narcotics on the packages.

20. Investigators continued physical surveillance of BURG and the Buick which traveled to the King of Budz medical marijuana dispensary located at 10457 Gratiot Avenue, Detroit, MI. Electronic surveillance of the Buick revealed BURG travelled to various other location in the greater Detroit area before returning to Ohio. Electronic surveillance of the Buick revealed the vehicle travelled to Springfield, Ohio and at approximately 9:37 p.m., the GPS tracker for the Buick arrived at **TARGET LOCATION 1**. At approximately 9:58 p.m., the GPS tracker revealed the Buick arrived at **TARGET LOCATION 3**. At approximately 10:25 p.m., the GPS tracker revealed the Buick arrived at **TARGET LOCAITON 2**.

10

21.     On September 21, 2021, I talked to Inspector Rose who queried the USPS database regarding packages delivered to **TARGET LOCATON 1** and **TARGET LOCATION 3**. Inspector Rose stated **TARGET LOCATION 1** has received approximately 11 USPS overnight packages of similar size and weight from the Detroit, MI area since March of 2021.    Inspector Rose stated **TARGET LOCATION 1** has received approximately 5 USPS overnight packages from the Las Vegas, NV area since March of 2021. Inspector Rose stated **TARGET LOCATION 3** has received USPS overnight packages of similar size and weight from the Detroit, MI area on September 11, 2021 and September 15, 2021. I reviewed the electronic surveillance data for the Buick which revealed on September 10, 2021, September 14, 2021 and September 15, 2021 the Buick was in the vicinity of **TARGET LOCATION 3**.

22.     On September 21, 2021, Inspector Rose acquired a signed search warrant for the aforementioned packages that BURG sent on September 20, 2021.  Inspector Rose located approximately 230 grams of pills that are consistent with an oxycodone pill's appearance and markings, which are marked with of various strengths, in the package intended for **TARGET LOCATION 3**. Inspector Rose located approximately 180 grams of pills that are consistent with an oxycodone pill's appearance and markings, which are marked with various strengths, in the package intended for **TARGET LOCATION 1**.  Inspector Rose indicated the pills were concealed within two tums bottles in the package intended for **TARGET LOCATION 3** and inside one Tums bottle for **TARGET LOCATION 1**.   Based on my training and experience in drug trafficking investigations, I have frequently encountered pills that have appearance consistent with oxycodone pills, but which ultimately are confirmed by laboratories to contain no oxycodone and rather are pressed fentanyl.  Furthermore, both Fentanyl and oxycodone are

Schedule II controlled substances and it is a violation of federal law to package and send these substance through the United States Post Service.

23.     In summation, investigators have observed CAMP and BURG frequently travel to and from **TARGET LOCATION 1** and **TARGET LOCATION 2** on multiple dates and at various times. Your affiant is also aware that BURG and CAMP have met Shannon BOWDEN, a Detroit, MI based drug trafficker, on several occasions wherein BOWDEN has also been observed entering and exiting **TARGET LOCATION 1** and **TARGET LOCATION 2**. Furthermore, your affiant is also aware that the Buick commonly utilized by CAMP and BURG has traveled to and from the Detroit, MI area, with all travel taking place on the same date, which is indicative of drug trafficking behavior.   Furthermore, **TARGET LOCATION 3** is believed to be a location utilized in furtherance of BURG and CAMP's drug trafficking activities by receiving suspected packages of drugs.

24.     Based on my training and experience, I know that drug traffickers frequently engage in the following common practices and activities, which likely result in the recovery of additional items of evidentiary value from **TARGET LOCATIONS**:

a.     It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

b.     It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c.      That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d.      It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e.      It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f.      It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g.      It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h.      That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i.      When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To

accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts. Drug traffickers frequently keep such records at their residences or at stash houses.

        j.    Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles. Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

        k.    It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list. Drug traffickers frequently keep such materials at their residences or at stash houses.

        l.    Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

        m.    Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms and ammunition of various types. Firearms are used to protect and secure a drug trafficker's

14

property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

      n.     Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

      o.     The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

       p.      Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

       q.      I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."   The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed.   The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.   Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

       r.      Drug traffickers often use computers to perform research concerning travel plans to meet sources of supply, store photographs of associates, drugs, firearms, and other contraband.

       s.      Drug traffickers frequently maintain at their residences or stash houses controlled substances as well as items used to process, sell and distribute these illegal drugs such presses, scales, baggies, vacuum sealers, cutting agents, gloves, masks, and other items.

//

//

//

//

16

25.        Based on the foregoing, I respectfully submit that there is probable cause to issue a search warrant for the above-described **TARGET LOCATIONS**.

Respectfully submitted,

_____
Austin M. Roseberry
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 21st day of September 2021.

_____
Sharon L. Ovington
United States Magistrate Judge

17

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

The property to be searched is:

a.     1701 W. High Street, Springfield, OH, including any lockers, basements, or storage areas associated with this location. **TARGET LOCATION** 1 is a single family home with white siding. There is a set of stairs that leads from the **TARGET LOCATION 1** to W. High Street. The Affiant can identify on sight.



**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

The property to be searched is:

a.  2641 Hibiscus Way, Apt. 221, Beavercreek, OH 45431, including any lockers, basements, or storage areas associated with this location. **TARGET LOCATION 2** is part of a red brick, multi-dwelling apartment complex located in the Beavercreek, OH area. There is a paved parking area to the west and south sides of the building. The Affiant can identify on sight.



b.



19

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

The property to be searched is:

a.    1710 N. Sweetbriar Lane, Springfield, Ohio 45505, including any lockers, basements, or storage areas associated with this location.   **TARGET LOCATION 3** is yellow and brown single-family home located in the Springfield, OH area. The Affiant can identify on sight.



b.



**ATTACHMENT B**

**Items to Be Seized**

I submit that there is probable cause to search for evidence, contrabands and fruits of violations of 21 USC § 841(a)(1), 843(b), and 846, including, but not limited to the following items:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F. United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I. Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J. Illegal drugs, including, but not limited to fentanyl, methamphetamine, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K. Firearms and ammunition.

L. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.